### In re ROSENSTIEL'S WILL.
No. 76-436.
Circuit Court, Dade County, Probate Division

June 24, 1976.

Woodrow M. Melvin, Jr. and Mark S. Silverio of Mershon, Sawyer, Johnston, Dunwody & Cole, Miami, and Greenbaum, Wolff & Ernst, New York City, for the petitioners.

Joseph F. Jennings of Bradford, Williams,, McKay, Kimbrell, Hamann & Jennings, Miami, for the respondents.

FRANK B. DOWLING, Circuit Judge.

*Order revoking order admitting second codicil to probate and letters of administration:* This cause came on for hearing before the court on the petition of Southeast First Naional Bank of Miami, as personal representative of the estate of Lewis S. Rosenstiel, deceased, joined by Maurice C. Greenbaum, trustee of an inter vivos trust, and Elizabeth Carol Rosenstiel, daughter of the decedent, for revocation of probate of the second codicil to the last will and testament of Lewis S. Rosenstiel, deceased, and to revoke letters of administration issued by this court to Cathy Finkelstein and James Finkelstein, as co-personal representatives.

Answer to the petition for revocation of probate has been filed by Cathy Finkelstein and James Finkelstein, as respondents to the petition for revocation.

Lewis S. Rosenstiel died at Mt. Sinai Hospital, Miami Beach, on January 21, 1976 at the age of 84. At the time of his death he was a multimillionaire, a giant in business, a benevolent philanthropist, and devoted husband and father. He left a last will and testament and a first codicil thereto that were admitted to probate by order of this court on January 26, 1976. By his last will and testament, Mr. Rosenstiel appointed the First National Bank of Miami as executor of his estate in Florida and trustee of a trust created by him in item four in his will in behalf of his stepdaughter, Diane Katleman Deshong. He further provided that in the event his estate should require administration in any jurisdiction other than Florida, he then nominated Maurice C. Greenbaum

and Wilbur Duncan as executors in such other jurisdiction or jurisdictions, and if they failed or were unable to qualify as such in those jurisdictions, they were given the power to designate by appropriate instrument such person or trust company having trust powers as they might select to act in that capacity.

Letters of administration were issued to Southeast First National Bank of Miami as the sole personal representative of the estate of the decedent on January 26, 1976.

On January 28, 1976 an amended petition for administration was filed in this estate by Cathy Finkelstein and James Finkelstein, who alleged that they were entitled to be appointed personal representatives of the decedent's estate by virtue of a codicil to the decedent's last will and testament dated December 6, 1975 and prayed to be so appointed as co-personal representatives. In a summary proceeding the codicil of December 6, 1975 was presented for probate together with proof thereof on January 28, 1976. This court entered its order admitting the said second codicil to probate and its order appointing Cathy Finkelstein and James Finkelstein as co-personal representatives with the Southeast First National Bank of Miami.

The second codicil dated December 6, 1975 purported to appoint Roy M. Cohn, an attorney at law of New York, Cathy Finkelstein, a granddaughter of the decedent, and her husband, James Finkelstein both of New York, as additional executors and trustees of his last will and testament. It is noted that this second codicil did not restrict the appointment to the decedent's estate in Florida, nor did it make reference to the appointment of co-personal representatives in other jurisdictions in any manner similar to the provision of the last will and testament with reference to the appointment of executors and trustees. Roy M. Cohn, being a non-resident of Florida and not related to the decedent, did not seek appointment as personal representative in this state and letters of administration as co-personal representatives were issued only to Cathy Finkelstein and James Finkelstein, her husband.

Notwithstanding his failure to qualify as a personal representative in Florida, if the second codicil be a valid testamentary instrument, Mr. Cohn would be qualified to serve in the capacity of trustee of the trust created in item four of the will, and by virtue of said second codicil, would possibly be qualified to serve as personal representative in other jurisdictions where the decedent's estate would have to be administered by virtue of substantial holdings in other jurisdictions.

The petition for revocation of the order admitting the second codicil to probate alleged that the same was executed by the dece-

dent at a time when he lacked testamentary capacity and that the alleged execution thereof had been secured by Roy M. Cohn through misrepresentation, trickery and fraud upon Mr. Rosenstiel. The respondents deny these allegations, alleging that the decedent possessed testamentary capacity on the 6th day of December 1975 and executed the second codicil freely and voluntarily with full understanding of the nature and the consequences of his act.

From the extensive testimony and documentary evidence offered by the parties to this cause, the court finds that Mr. Rosenstiel had suffered a stroke in 1971 which left him impaired physically to the extent that he could not walk without assistance and that his speech was at times slurred and difficult. Notwithstanding this disability, Mr. Rosenstiel continued to follow his social and business activities although at times a fairly sick man up to September of 1975. At that time he was at his farm place in Greenwich, Connecticut when he began to suffer abdominal discomfort of a serious nature. He was flown to Miami by private plane and almost immediately thereafter was admitted as a patient to Mt. Sinai Hospital, experiencing almost continuous vomiting episodes. His hearing was poor and his eyesight was severly impaired from previous surgery. At the time of his admission to Mt. Sinai and until his death on January 21, 1976, he suffered from prostate cancer, diabetes, high blood pressure, kidney failure, uremia, anemia, metabolic blood disorder, and atrial fibrillation, leading to episodes of heart failure. On the early morning of September 27, 1975, Mr. Rosenstiel suffered four convulsions, and in October 1975 a brain scan revealed moderately advanced cortical atrophy and Alzheimer's Disease, causing pre-senile dementia. On October 17, 1975 one of Mr. Rosenstiel's physicians, Dr. Scherr, entered a medical order that the nurses and attendants were not to permit Mr. Rosenstiel's visitors to engage him in business discussions or decisions.

During his terminal illness at Mt. Sinai Hospital, Mr. Rosenstiel was attended by four physicians, Doctors Ronald Scherr, Eugene Rosenberg, Harold Reed and Gerald Steinberg, who treated him for the disorders and disabilities previously enumerated. Each of these doctors testified that in their medical opinion Mr. Rosenstiel lacked the ability to manage or conduct any type of business or personal matters. He was, during this period of time, constantly found to be lethargic, confused, disoriented and suffering from severe mental obtundation. Two of his physicians, Doctors Reed and Rosenberg, visited and examined Mr. Rosenstiel on the morning of December 6, 1975, and both testified that in their medical opinion he lacked the mental ability to conduct any type of business or personal matters on that date. No medical testimony as to the mental or physical condition of the decedent at or about the time

of the execution of the alleged second codicil has been presented by the respondents.

The court further finds that Mr. Rosenstiel was constantly attended by registered nurses and nursing attendants. Mrs. Adele Rosen and Tricide Philogene, both registered nurses, were on duty with Mr. Rosenstiel on December 6, 1975, as was Thomas Springer, a male attendant. The nurses and the attendant have testified that at that time his level of comprehension was so poor that he could not discuss or explain his symptoms or ailments to his doctors or nurses, that he could not carry on a conversation with anyone, that he was confused as to person, time and place, and from their observation of him, he was unable to engage in any business decision or transaction.

During this morning of December 6, 1975, Mr. Roy M. Cohn, in company with his friend, David Tackett, came to Mr. Rosenstiel's room at the hospital and stated to the nurse Philogene that he had a document that he wanted Mr. Rosenstiel to sign and for them to witness that related to Susan Rosenstiel, a divorced fourth wife of the decedent, and litigation still pending between her and Mr. Rosenstiel. The nurses and attendant refused to witness any document on the grounds that it was against hospital policy for them to do so, and also because Mr. Rosenstiel was in no condition to transact any business. Upon urging, the nurse Philogene advised Mr. Cohn that she would go to the hospital administrator and get him to come up and decide if the witnessing of the document should take place, and she left the room. The attendant, Thomas Springer, testified that when Mr. Cohn came in to the room he went over to the bed and talked to Mr. Rosenstiel and said, "I have a paper here I would like to get signed today to terminate the affairs of 'Suzie' ". Mr. Springer further testified that Mr. Cohn had brought up the affair of "Suzie" before he was asked to sign the paper, that he was telling Mr. Rosenstiel about "Suzie", and that things had not been going too well for her and there was a possibility that she was going to jail, and that this (meaning the paper) will take care of it. Mr. Springer further said in his testimony that Mr. Cohn said to Mr. Rosenstiel, "You know all of these things, Lew. She has not got a leg to stand on. This will take care of it once and for all. It will be finished."

This testimony is corroborated by the nurse Philogene. Mr. Springer suggested to Mr. Cohn that if any papers were to be signed they should contact Mr. Joseph Pearlman who was at Mr. Rosenstiel's home and who was a counsellor and advisor to Mr. Rosenstiel over a period of many years. Mr. Pearlman was called at the Rosenstiel residence and was told that some gentlemen were there to have some papers signed by Mr. Rosenstiel. At no time was Mr. Pearlman advised that the paper to be signed was a second codicil

to Mr. Rosenstiel's last will and testament. Mr. Pearlman asked to speak to Mr. Rosenstiel and Rosenstiel is said to have stated over the phone that "Roy Cohn was doing something for him which was nobody's damn business and to forget it." That concluded the telephone conversation with Mr. Pearlman. At that time Mr. Springer refused to have anything to do with the transaction, left the room, and entered the hall outside the door, leaving the door partly open. Mr. Rosenstiel, Roy M. Cohn and David Tackett were the only persons then in the room. Mr. Springer testified as he left the room that he saw Mr. Cohn arranging for Mr. Rosenstiel's signature on a paper. Although he was in the hall by the side of an open door, he did not hear the codicil read to Mr. Rosenstiel, nor did he hear any explanation from Mr. Cohn to Mr. Rosenstiel of the nature of the document that he was signing as being a codicil to his will. About that point of time the nurse Philogene returned to the room with the hospital administrator, Mr. Babcock. When Mr. Babcock inquired if he could be of assistance, he was told that they did not need him, that they were just there to visit Mr. Rosenstiel as a social call, and there was no business to be transacted, whereupon Mr. Babcock immediately left. The nurse Philogene further testified that after Mr. Babcock left and before Roy Cohn and David Tackett signed the document as witnesses, Mr. Cohn then asked her again to be a witness to the signature of Mr. Rosenstiel, although she had not been present in the room at the time the writing by Mr. Rosenstiel had been placed on the document. When she again refused, then Mr. Cohn and Mr. Tackett witnessed the paper.

The purported signature of Mr. Rosenstiel upon the second codicil has been described as some "squibbly lines." Certainly an examination of the same discloses nothing more than some lines on the paper at the place for the testator's signature. No discernable letter of the alphabet appears. While demonstrating the debilitated physicial condition of the decedent, this of itself would not invalidate the document as a testamentary writing. It is a sound, lucid and understanding mind, not a sound body, that determines the validity of a testamentary document. All that the law of Florida requires in that respect is that the testator make his writing upon the document at a time when he possessed testamentary capacity, with full knowledge of the contents of the document and the nature of the same, and that he sign it in that manner with the intent to execute a testamentary instrument. The fact that it is made with an "X" or other scratching or scroll is immaterial if the other elements of the lawful execution of a testamentary document are present. *In re Estate of Williams,* Supreme Court of Florida, December 15, 1965; 182 So.2d 10.

In addition to the medical testimony and the testimony of the nurses and attendants, additional testimony as to Mr. Rosenstiel's testamentary capacity has been presented by both the petitioners and the respondents through lay persons, long-time friends, and business associates of the decendent. The testimony of these persons is at best conflicting. Professor Leonard J. Emmerglick, who chaired the Rosenstiel Chair for constitutional law at the University of Miami Law College, and a long-time personal friend and confident of Mr. Rosenstiel, testified that at the time of the execution of the codicil and before and after the same, Mr. Rosenstiel was unable to recognize him when he came to visit until his identity was made known. Professor Emmerglick was a regular visitor to the hospital during Mr. Rosenstiel's last illness and saw him frequently. He testified that in his opinion Mr. Rosenstiel was confused, disoriented, unable to recognize his friends or family without suggestion from others as to identity, and in his opinion was incapable of conducting any business affairs at the time in question.

In February 1975 Mr. Rosenstiel was to enter the hospital and at that time he had great concern over his survival. He called his friend, Professor Emmerglick, to have the professor's secretary write some letters for him to his friends and to members of his family. The letters were dictated by Mr. Rosenstiel to the secretary who typed them, and upon Professor Emmerglick's recommendation to Mr. Rosenstiel, it was agreed that the letters would not be mailed to whom they were addressed but would be retained by Professor Emmerglick to be mailed at an appropriate time which he, the professor, understood to be upon the death of Mr. Rosenstiel. It is of significance to note that Mr. Rosenstiel wrote letters of farewell to his wife, his daughter, his step-daughter, to his beloved friends, Louis B. Nichols, Professor Emmerglick, and others, but no letter was addressed to Cathy Finkelstein, his granddaughter, or her husband, James, nor was a letter addressed to his attorney and friend of some 30 years, Roy M. Cohn. Yet it was these three people, whom he did not remember with letters of farewell, that the respondents urge the court to believe that Mr. Rosenstiel chose to be the majority of those he would name to be the administrators and trustees of his multi-million dollar estate.

The respondents have urged that the reason for the addition of Mr. Roy M. Cohn, Cathy Finkelstein, and James Finkelstein as additional executors and trustees was Mr. Rosenstiel's express desire that he wanted Roy M. Cohn because he was a "fighter"; that he would look after and protect the interest of the daughter, Elizabeth Carol Rosenstiel. It is represented that the Finkelsteins were joined because Cathy and James would be good for Elizabeth

Carol Rosenstiel and look after and protect her interests. An examination of the last will and testament of Mr. Rosenstiel, in the light of the second amended codicil, clearly discloses that those who prepared the second amended codicil had no knowledge of the contents of the will, or of Mr. Rosenstiel's testamentary plans for the disposition of his vast estate. The argument presented loses its substance and weight when the will discloses that the only bequest made to the daughter, Elizabeth Carol Rosenstiel, was the personal furniture, furnishings and household possessions in the Greenwich, Connecticut home which constituted an infinitesimal portion of the testator's estate. Referring to the appointment of additional trustees, an examination of the last will and testament discloses that the only trust in which they could serve in a supervisory capacity was the trust created in item four which was for the benefit of Diane Katleman Deshong and in which the daughter, Elizabeth Carol Rosenstiel, only had a contingent remainder interest. So with respect to the interest, welfare and protection of the daughter by the co-executors and trustees, the last will and testament disclosing the testamentary dispositive plan of the testator indicates that there was nothing in the administration of the estate for Mr. Cohn to fight for, except the possession of the personal property in the Connecticut home and nothing for the trustees to oversee and administer in so far as the daughter, Elizabeth Carol Rosenstiel, was concerned. The entire residual estate is poured over into the trust created by Mr. Rosenstiel during his lifetime in which he and Maurice C. Greenbaum were the trustees and over which Maurice C. Greenbaum appears to be the sole remaining trustee after the death of Mr. Rosenstiel. Neither Mr. Cohn nor the Finkelsteins can act as trustees of this inter vivos trust. Here lies the bulk of the Rosenstiel fortune and here is the source of the future interest, maintenance and welfare of the daughter, Elizabeth Carol Rosenstiel. Had it been Mr. Rosenstiel's desire that Mr. Roy M. Cohn and the Finkelsteins be placed in a position to act as trustees for the protection and benefit of the daughter, it is in the inter vivos trust that they would have been named as co-trustees and not as executors of a bequest of household furnishings and as trustees of a trust created for the benefit of the step-daughter, Mrs. Deshong.

Louis B. Nichols, with a long career in government, public and charitable callings and in business, a close personal friend, consultant and confident of Mr. Rosenstiel, testified that on December 8, 1975 two days after the execution of the codicil, he had a telephone conversion with Mr. Rosenstiel that lasted about five minutes; that Mr. Rosenstiel was very sharp and showed perfect comprehension of what he was saying. He was of the opinion that

Mr. Rosenstiel had excellent recall of past events and that his conversation was lucid and clear, and as a result of the conversation on that day, he felt that Mr. Rosenstiel was in a cheerful mood and seemed to be his old self.

Mr. John Beemer, who worked for Mr. Rosenstiel for 40 years as his executive assistant, testified that he talked with Mr. Rosenstiel by telephone in December 1975 and discussed with him a zoning question relating to Mr. Rosenstiel's property in Connecticut, and at that time Mr. Rosenstiel was lucid, understood the conversation, the topic under discussion, and told Mr. Beemer to find out what acreage was involved and to get in touch with Frank Lennon, an attorney in Greenwich, and report back to him.

Testimony of Mr. Victor Aldridge disclosed that he visited with Mr. Rosenstiel, discussed business matters with him; that Mr. Rosenstiel was clear, lucid and engaged in normal conversations. Mr. Aldridge had been an associate of Mr. Rosenstiel for a period of approximately 15 years.

Notwithstanding the conflict in the testimony of the lay witnesses as to the competency of Mr. Rosenstiel, if at the time of the execution of the codicil he, even in part, was alert, very sharp, had perfect comprehension, excellent recall of past events, lucid and understood the topic under discussion, it is almost beyond comprehension that Mr. Rosenstiel in his hospital bed with all the events of the morning of December 6, 1975 taking place in his immediate presence, would have remained mute, speaking to no one present. and giving no directions or expressing his desires. If he were indeed capable of understanding the events and conversation taking place about him, the only fair conclusion of his understanding is that the document he was being requested to sign related to his divorce litigation with his former wife, Susan, as that was the only document or transaction referred to in the verbal conversation on that occasion while any disinterested party was physically present in his room.

The second codicil was prepared by a party in interest, Roy M. Cohn (physically typed by his law partner, Mr. Bolan). It was presented to the testator for signature only in the presence of Mr. Cohn and a witness procured by him, his friend, Mr. Tackett. After its execution, no copy was left with the testator or given to any person present although Mr. Cohn stated he was leaving a copy of the document in the room. After its execution, Mr. Cohn as an interested party retained possession of the original document until after the testator's death when it was then produced and first became known to the testator's family, business associates, and previously appointed executor and trustees.

The court having considered the testimony, the exhibits, and heard the argument of counsel, now finds that on December 6, 1975 the decedent, Lewis S. Rosenstiel, did not possess testamentary capacity and was incapable of voluntarily and of his own free will executing a valid testamentary instrument.

The court further finds from the evidence that Roy M. Cohn misrepresented to the decedent, Lewis S. Rosenstiel, the nature, content and purpose of the document that he offered to Mr. Rosenstiel for execution; that at the time of the placing of the lines upon the second codicil to his last will and testament, Lewis S. Rosenstiel had no present knowledge or understanding that the document related to a codicil to his last will and testament and such execution was not done with a conscious testamentary intent.

It is now, therefore, ordered and adjudged that the order of January 28, 1976 admitting the second codicil to probate be and the same is hereby revoked, annulled and set aside.

It is further ordered and adjudged that the letters of administration issued to Cathy Finkelstein and James Finklestein as co-personal representatives of the estate of Lewis S. Rosenstiel on January 28, 1976 be and the same are hereby revoked, annulled and set aside.

\* \* \* \* \*

The attorneys for the respondents filed the following —

## POST-TRIAL MEMORANDUM IN BEHALF OF RESPONDENTS

The Second Codicil to the Last Will and Testament of Lewis S. Rosenstiel, Deceased, dated December 6, 1975, was admitted to Probate in this cause by Order of this Court dated January 28, 1976. Revocation of that Probate is now sought by petitioners upon a myriad of grounds, none of which it is respectfully submitted is legally sufficient or factually persuasive.

The said Second Codicil effects no substantive change in the dispositive provisions of the Will nor does it seek to remove any personal representative or trustee therein named. Quite the contrary, for as this Court sagely observed on February 3, 1976:

"There is nothing in this codicil that revokes any portion of the former will and codicil.

"There is no disturbance of any provision in the original will and codicil admitted to probate in any manner whatsoever. It simply adds additional co-executors."

The petition for certiorari from the order denying the motion to vacate has been dismissed since conclusion of this trial.

Moreover, the co-executors added by said Codicil are neither unusual nor unnatural nominees, but consist of decedent's granddaughter, her husband, and the testator's attorney for twenty years (who could not and has not applied for administration here).

The evidence — and lack of evidence — elicited at the trial of this cause is analyzed hereinafter. As for the law, it goes without saying that when making a presentation to this particular Court, it is hardly necessary to review in any detail the applicable cases, but a brief reference to a few of them might not be inappropriate, especially in view of their applicability to specific facts and issues in this proceeding.

"The right or privilege of disposing of property by will is highly valuable, and it is the policy of the law to hold wills good wherever possible." *Skelton v. Davis,* 133 So.2d 432, 435 (Fla. 3 DCA 1961). "This, according to the authorities, is particularly true of old people." *In re Starr's Estate,* 170 So. 620, 624 (Fla. 1935).

In recognition of this policy, "(t)he burden of overthrowing a will on the ground of lack of testamentary capacity is a heavy one and must be sustained by a preponderance of the evidence." *In re Kiggins' Estate,* 67 So.2d 918 (Fla. 1953).

*In re Wilmott's Estate,* 66 So.2d 465 (Fla. 1953), states the rule as follows:

> "The making of a will does not depend upon a sound body but upon a sound mind. By 'sound mind' is meant the ability of the testator 'to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator's relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of the will as executed."

*       *       *       *

> "If the testamentary requisites are found, the will may be valid, although executed by one of great age, whose mind is enfeebled, whose body is debilitated, whose memory is failing or whose judgment is vacillating, especially where the will appears to have been fairly made, is not an unnatural one, and apparently was made under conditions not inconsistent with the inference that it emanated from a free mind.' "

In accordance with this principle, the court in *Starr, supra,* reversed the holding below and directed probate of a will executed by

> "an old lady, somewhat childish, considerably forgetful, very reticent, who merely wanted to retire into a shell and not even be burdened with talking to others unless it was something especially interesting to her, but with plenty of knowledge of people and things in which she was interested; who did not always answer questions, but could do so intelligently."

"The principle of law that testamentary capacity is to be judged solely at the time of the execution of the will is irrefragable and no authority need be cited." *Skelton v. Davis, supra.* As will be demonstrated below and as is respectfully submitted, at the time of execution of the Second Codicil testator was fully competent and aware of the effect the addition of co-executors would have on the administration of his estate. It was a matter he had considered and discussed with his attorneys for months and it represented his final testamentary wish.

## POINT I

### EVENTS LEADING TO THE CODICIL

It is clear from the position of all parties and witnesses that no question whatsoever concerning Mr. Rosenstiel's testamentary capacity existed prior to his entry into Mount Sinai Hospital on September 16, 1975.

Mr. Rosenstiel's wish to add executors and trustees, and the reasons therefor were set forth by him to Mr. Bolan at Mr. Rosenstiel's home in Greenwich, Connecticut, at this time when testamentary capacity is not challenged. The meeting in Greenwich dealt with questioning references by Mr. Rosenstiel to advice he had received from Mr. Bolan to the effect that he could not control selection of counsel on the part of his executors and trustees (519-520) [page references to trial transcript or exhibits in evidence]. Mr. Rosenstiel informed Mr. Bolan that in any event he had decided to add executors and trustees (520). He expressed dissatisfaction with the way in which Greenbaum had been handling certain matters for him recently (521-522). He also referred to problems with the Florida bank (522). He said that he wanted Roy Cohn as an executor and trustee (522-524). There was a discussion about naming Louis Nichols, but Mr. Rosenstiel ruled him out on the grounds of age and health (523). In discussing additional names, Mr. Bolan, who had consulted Florida counsel, pointed out that executors acting in Florida must be either Florida residents or blood relatives (522). Mr. Rosenstiel stated that the blood relative got down to "Libby" (his daughter Elizabeth), or "Cathy" (his granddaughter) (523).

Mr. Rosenstiel stated that Libby should not have the responsibility of being an executor as "she was surrounded by people that were a bad influence on her" and "might continue to have this influence" (523). He said that Cathy and Jimmy Finkelstein "had always been good to his daughter" and "would continue to be good for her and that they would protect her." (523) Mr. Rosenstiel wanted to add Roy, Jimmy and Cathy as executors and trustees (522-4). Mr. Rosenstiel stated that he did not wish to remove either Mr. Greenbaum or the bank but did not want them to have the final say on his estate (521; 525). Mr. Rosenstiel stated that he did not want Mr. Greenbaum or his family informed of his change in executors and trustees (520). Mr. Rosenstiel stated that there was a will, the trust, and the one or two codicils on insignificant matters (520-521). When Mr. Bolan asked Mr. Rosenstiel to get copies or at least the dates, Mr. Rosenstiel expressed his reluctance to do so because this would involve letting Greenbaum know that he was making this change (520-521).

Pursuant to appointment, Mr. Bolan met with Mr. Rosenstiel on the early afternoon of November 10, 1975, with Mr. Cohn. Mr. Rosenstiel told Mr. Bolan to go ahead with the codicil adding Jimmy, Cathy and Roy (525). He stated again that Jimmy and Cathy would be good for Libby (525-526). Mr. Bolan asked for the dates of the will and codicils and Mr. Rosenstiel said he would see what he could do (526). Mr. Bolan thereafter asked Mr. Cohn to request the dates from Mr. Rosenstiel one further time (527-528). Mr. Cohn reported back that he had done so and Mr. Rosenstiel would not be asking for the dates. Mr. Bolan proceeded to type the codicil in the manner fully described on the witness stand and gave it to Mr. Cohn to have executed on the occasion of Mr. Cohn's next trip to Miami (528). Mr. Bolan's testimony was clear-cut and unimpeached in any way.

But we need rely not just on Mr. Bolan's testimony concerning the views and motives of Mr. Rosenstiel in making this change. Petitioner Greenbaum's own testimony confirms Mr. Rosenstiel's motives on each of the points Mr. Rosenstiel raised with Mr. Bolan. Mr. Greenbaum conceded that in the Spring of 1975 there had been strong differences of opinion between Greenbaum and Cohn as to the handling of certain key litigation which was of much importance to Mr. Rosenstiel, and that he had objected "rather strenuously" to Rosenstiel to the suggestion that Cohn act as co-counsel with him (451-452). Greenbaum conceded that Mr. Rosenstiel had questioned Mr. Greenbaum's judgment "very seriously" (451), and had urged Mr. Cohn's procedures for handling the matters. This dispute, of course, took place *after* the Emmerglick letters. Greenbaum's own version is completely supportive of Mr. Rosenstiel's reasoning in wishing to add Roy Cohn. Greenbaum further confirmed Mr. Rosenstiel's problems with and dissatisfaction with the Florida bank,

which had been the sole executor until the codicil was executed (452-453). Seymour Roberts, a witness for petitioners, also confirmed the difficulties that were being had with the bank (826). As to Mr. Rosenstiel's fears concerning the people surrounding Libby and his preoccupation with taking steps to surround her with protective persons and legal devices, Greenbaum confirmed this point of view almost exactly as Mr. Rosenstiel had expressed it to Mr. Bolan (502-503).

A dramatic illustration of the realization of Mr. Rosenstiel's fears, and a clue to the continuing hold on Elizabeth of the influences Mr. Rosenstiel feared so much, took place within the last minutes of this trial. As the only rebuttal witness to appear in person the petitioners called Lorna Kent. Her testimony ranged from insignificant to being helpful to the respondents in that she quoted Mr. Cohn as stating at Mr. Rosenstiel's funeral that he "was concerned about Elizabeth's well being" and . . . "intended to protect her" (837) — a goal certainly consistent with Mr. Rosenstiel's wishes. But the real significance in her production just the other day lies in the continuing relationship between Elizabeth and the Kent family. Lorna Kent's mother, known as "Momma" Kent, has surrounded Elizabeth Rosenstiel for years. She has lived at Elizabeth's apartment (846). She was at the hospital when Elizabeth visited her father; but although yards away from the door of Mr. Rosenstiel's hospital room for a period of months, at no time was "Momma" Kent permitted to cross the threshold of that door, obviously because her influence on Elizabeth was distrusted and rejected by Mr. Rosenstiel (846-850).

For petitioner Greenbaum, combined with Elizabeth as co-petitioner, to close this case with the testimony of the daughter of Elizabeth's confidant who could not enter Mr. Rosenstiel's presence, speaks volumes concerning Mr. Rosenstiel's wisdom in making the additions.

Mr. Rosenstiel's instructions to Mr. Bolan in not discussing the change he was making and his reluctance to alert Greenbaum to what he was doing by asking for dates of prior instruments, was characteristic of Mr. Rosenstiel's way of doing things. He was secretive (725). In a directly analogous situation years ago, Louis Nichols related how he was named an executor in a testamentary document and was given simultaneous instructions to discuss it with no one because Mr. Rosenstiel did not wish another firm of his attorneys to know that there was an additional testamentary instrument which they had not drawn. Mr. Nichols was "cautioned . . . not to disclose this to anybody because there was another will in another lawyers's office and they did not want anybody to know about the new will. That is a fact." (724)

Mr. Bolan is an attorney of 25 years experience, much of it in trusts and estates. He worked as a legal secretary with a trust and estates firm during the day, and attended college and law school at night — graduating summa cum laude from each. He has had an impeccable record as a federal prosecutor and a member of the bar. The cross-examination detracted not one whit from the credibility and precision of his testimony.

## POINT II
## EXECUTION OF THE CODICIL

The codicil as prepared by Bolan pursuant to Mr. Rosenstiel's direction was properly executed under Florida law on the morning of December 6, 1975. The two attesting witnesses, David Tackett and Roy Cohn, testified that the codicil was displayed to Mr. Rosenstiel and read to him word for word on that morning. They testified that Mr. Rosenstiel stated that it was "what he wanted" (70, 16). Both witnesses testified that Mr. Rosenstiel asked them to sign as witnesses to the affixing of his signature on the codicil to his last will and testament (16, 71). No other person was present in Mr. Rosenstiel's room at the time the codicil was read

to him and at the time he signed it and at the time the witnesses executed it (17). Tom Springer testified that he was outside the door and could not hear the reading or any of the conversation (262-263). Springer testified that he and Philogene remained outside the door of Mr. Rosenstiel's room for from five to seven minutes while Dave Tackett and Roy Cohn were there alone with Mr. Rosenstiel tending to the execution (253).

The issue of the other and totally different paper concerning Susy that was left for Mrs. Blanka Rosenstiel with Springer, will be discussed *infra*.

No witness disputes the sworn testimony of Tackett and Cohn that the codicil was read to Mr. Rosenstiel, that he understood it and described it as what he wanted, and asked that it be witnessed as it was. At the commencement of this case, when petitioners asked for withdrawal of the codicil to have Mr. Rosenstiel's signature examined by Robert Vollmer, respondents immediately consented to have this done. Mr. Vollmer could reach no conclusion concerning the writing, as he had no basis for comparison (318). Mr. Rosenstiel's ability to write was confined to his left hand since his right side stroke several years before, and along with his strength his ability to write became more of a struggle. Although Mr. Vollmer could not reach a conclusion, the witness Hannah Polansky, called by petitioners, confirmed that in 1975 Mr. Rosenstiel's endorsement on checks was "not legible," and described how she had to guarantee to the teller where she cashed the check that the signature was that of Mr. Rosenstiel. An examination of respondent's exhibits C-1 and D-1 in evidence consisting of certified copies of documents signed by Mr. Rosenstiel in September of 1975 before he entered the hospital and suffered the convulsive seizure, show the deterioration in his ability to sign legibly and even to a layman's eye, tie in with the manner of signing on December 6, 1975.

Most significantly, the one conclusion that Mr. Vollmer could reach was completely supportive of the testimony of Tackett and Cohn. He testified that he believed that the pen used by Mr. Rosenstiel for his signature was the same one that Dave Tackett used when he signed as a witness to Mr. Rosenstiel's signature (320-321). Before Vollmer announced this conclusion, Tackett had testified to that effect (90).

Dave Tackett is an intelligent, young executive, associated with liquor and food businesses operated in several states in the northeast (68, 25). He had known Mr. Rosenstiel for the last couple of years of Mr. Rosenstiel's life (81, 25). He testified that although ill, he found Mr. Rosenstiel to be of sound mind (71) and "totally coherent" (84). "He made himself completely understood" (85). They discussed matters of business (63). Despite five months of obviously intensive investigation of this case, petitioners have failed to suggest, no less prove, any conceivable motive on Tackett's part to give other than truthful testimony. He has no interest or stake in the outcome of this proceeding whatsoever. In order to succeed here, petitioners must at a minimum start with the destruction of Tackett's testimony and credibility and they have failed to even attempt this. The best they could do was to suggest he has too many addresses, and that the address given on the codicil and at the trial is the address he uses as the center location for the receipt of mail as he travels constantly (74-77).

The Joseph Pearlman incident might be discussed at this point. Pearlman executed an affidavit — indeed the only one attached to the original petition to vacate herein. This affidavit was conceived in a conversation Mr. Melvin had with Pearlman on January 28, 1976 (659-660). The affidavit itself was prepared in Mr. Melvin's offices the next day. It contains obvious mistakes and misstatements of fact, raising the immediate question that it could not have been carefully reviewed by Pearlman before he signed it. A wrong middle initial is given for Mr. Rosenstiel, and the reference to time spent by Pearlman at the hospital in the afternoon was "three hours," when it should have been "three minutes."

Some time after the affidavit was filed, Mr. Cohn learned that Pearlman had said that it was inaccurate and incomplete (667-670). He called Pearlman, who would see him only with Pearlman's lawyer present. Pearlman had no counsel present at the time of the Greenbaum-Melvin affidavit of January 29, 1976. It developed that Pearlman had indeed spoken to Mr. Rosenstiel on the telephone minutes before the codicil was executed, and that Mr. Rosenstiel had told him that Roy Cohn was doing something for him which was "nobody's damn business" (638). This conversation was, of course, heard by Tackett and Cohn, who were at Mr. Rosenstiel's bedside when Tom Springer placed this call to Joseph Pearlman and when in Springer's presence Mr. Rosenstiel spoke to Pearlman just before the execution.

Petitioners seem to now suggest that Pearlman's account of a telephone conversation with Mr. Rosenstiel just prior to the signing of the codicil is a recent contrivance by Pearlman in some inexplicable way connected with the fact he is among many dozens who have filed claims against the estate. To support this, petitioners point to the fact that the January 29, 1976 affidavit does not mention the telephone call and seems to suggest that it therefore never took place. But the proof of the telephone call between Pearlman and Rosenstiel comes not from Tackett, Cohn or Pearlman himself, *but from petitioners' own witness, Tom Springer.* Springer testified that indeed he was the one who placed the telephone call to Mr. Pearlman at the Rosenstiel residence from Mr. Rosenstiel's hospital room (247-248). Springer confirmed the testimony to this effect from both Tackett and Cohn (73, 55). Springer flatly confirmed the fact that Mr. Rosenstiel spoke with Pearlman over the telephone as described by Tackett and Cohn just before the signing. Tackett, Cohn and Pearlman recall what Rosenstiel said on his end of the conversation, but Springer is unable to recall what Mr. Rosenstiel said, other than concluding after the conversation that it was all right for the paper to be signed (248). Pearlman did not fantasize this telephone conversation with Mr. Rosenstiel. It was initiated by Tom Springer himself.

Other omissions from the Pearlman affidavit included the fact that Mr. Melvin displayed the codicil to Pearlman who described the signature as looking just like the way in which Mr. Rosenstiel had been endorsing checks.

## POINT III
## THE "FRAUD" THEORY

Among petitioners' bag of theories is one they describe as "fraud." Apparently they mean to suggest that what Mr. Rosenstiel thought he was signing on December 6, 1975 was not the codicil he had told Bolan to prepare, but some paper requiring his signature dealing with his former wife, Suzy. The beginning and end of this theory lies in obvious and demonstrable confusion and cross-contradiction by Tom Springer and Trudy Philogene, both of whom are certainly well-meaning and not wilfully misrepresenting events. There was indeed a paper bearing on a case seeking a payment from Mr. Rosensteil for services rendered to Susy. This paper was not a one page codicil to be signed by Mr. Rosenstiel, but was seven pages of a statement by a Miami process server, Steve Hunter, Jr., with attachments. The paper claimed service on Mrs. Blanka Rosenstiel (Respondents' Exhibit A). It in no way called for, required or had any place for any signature by Lewis Rosenstiel, nor did it refer to any contact with him (Respondents' Exhibit A).)

On November 11, 1975, the Nizer firm, which had represented Susy, was suing for services rendered to her, served papers including this Hunter statement on Mr. Cohn's law firm in New York (66). Daniel Driscoll, one of the partners who handled Mr. Rosenstiel's matters, submitted reply papers in which he disputed legal service under the laws of New York by virtue of Hunter's contact with Mrs. Blanka Rosenstiel. But no contravening affidavit concerning this was submitted by Mr. Driscoll. On December 5, 1975, at 12:30 p. m., hours before Mr. Cohn flew to Miami, the Nizer firm delivered to Saxe Bacon legal papers containing, among other things, a demand

for a formal contravention of the events set forth in Hunter's statement concerning his attempt to serve Mrs. Blanka Rosenstiel (67). Driscoll asked Cohn to take this Hunter statement to Miami and make sure that Mrs. Blanka Rosenstiel received it and reviewed it in case her version became necessary.

It was this paper that Cohn told the nurses about (30, 31, 33). It was this paper, dealing with Susy's case, that Cohn physically left with Springer before departing that day with the request that it be given to Mrs. Blanka Rosenstiel (33). It is this paper and the discussion concerning it that Springer confused with the codicil situation. Springer concedes that at no time was he present in the room, nor did he hear any of the conversation during the five to seven minutes that Mr. Rosenstiel handled the execution of the codicil. Any doubt that the paper involving Susy was exactly as represented by Cohn, namely, the seven page paper left with Springer for Mrs. Blanka Rosenstiel, was disspelled the last morning of the trial. Petitioners stipulated that Mrs. Rosenstiel would testify that the paper, identified by Cohn (Respondents' Exhibit A) was precisely what was delivered to her from the hospital room following her return shortly after December 5, 1975. Springer made this confusion on his part all the more clear when he confirmed that the paper Cohn left, which Springer thought Cohn said was a copy of what Mr. Rosenstiel had signed, was left by Cohn with Springer open and half folded. Thus, it was plain and obvious for one and all to see that it was nothing signed by Mr. Rosenstiel or even calling for his signature. Far from concealment or confusion, Cohn had readily asked Springer to make sure that the opened document he left was given to Mrs. Blanka Rosenstiel, which indeed it was.

It is undisputed that Mr. Cohn requested Mr. Springer and Mrs. Philogene to be "witnesses." Obviously they could not have been valid witnesses to the codicil unless the testator had advised them that the document was a codicil to his will and unless he requested them to sign as witnesses with that knowledge. A fortiori, had they in fact agreed to act as witnesses it would have been necessary that they be fully informed as to the nature of the document to be signed. What sense of logic, therefore, would have ever impelled Mr. Cohn to tell them, as is claimed, that the paper related to Susy when, had they agreed to witness the instrument, they would have had to have been informed that the document was in fact testamentary in nature? It is inconceivable that Mr. Cohn would have tried to deceive them as to the inconsequential nature of the instrument yet at the very same time ask them to act as witnesses under circumstances in which they would have had to know he had deceived them. The only answer is that Springer and Mrs. Philogene are confusing the two matters of business on the agenda that day, i.e., (1) the document relating to Susy's attorneys' suit against the decedent which he left for Blanka; and (2) the codicil which Mr. Cohn asked them to witness. That confusion exists only in their minds. It was never created by Mr. Cohn — and an examination of the paper relating to Susy's case (Respondents' Exhibit A) shows it did not and could not be intended for Mr. Rosenstiel or his signature. The nurse's confusion and petitioners' theory is finally established by the fact Cohn left Respondents' Exhibit A in open, unsealed form — not even in an envelope — so that cursory examination of it by Mrs. Rosenstiel, for whom is was intended, or Springer, or anyone else through whose hands it passed in open form, would show it was not a copy of anything signed by Mr. Rosenstiel.

Springer and Philogene contradict each other on virtually every other event in which they both participated concerning this incident. Springer correctly stated that only Tackett was with Cohn (245). Philogene insisted right through the trial that there were "two men" with Cohn (168). Philogene stated that she greeted Cohn when he first arrived and summoned Springer (147). Springer is very clear that it was he who greeted Cohn and that Philogene appeared only later (239). Philogene testified that after everything was over and Mr. Babcock had left the room,

Cohn was still in the witnessing process and asking her or Tackett to sign as a witness (150). Springer completely contradicts this and states that the execution of the paper was no longer dealt with or referred to after he and Philogene reentered the room (254, 255). The logic of the occasion totally supports this. If there was some kind of deception or fraud being practiced, it would have been the easiest thing in the world for Cohn to *exclude* the nurses from the room, just as Greenbaum had done on September 27, 1975. Instead, Cohn asked Springer and/or Philogene to witness Mr Rosenstiel's signature to the document, knowing full well that a codicil is invalid unless the testator acknowledges it in front of the witnesses as a codicil to his last will and testament, and unless he asks both of them to sign as witnesses to his signature to a codicil to his last will and testament.

This and only this constitutes petitioners' "fraud" theory. Far from approaching the requirements of fulfilling a heavy burden of proof, petitioners' presentation or lack of presentation on this point does not even rise to a level warranting serious consideration.

## POINT IV
## MENTAL COMPETENCY

The bulk of the medical testimony adds little of relevance to the issue here, as it deals with the proposition that is axiomatic: Mr. Rosenstiel was 84 years old at the time of his death, and had been physically deteriorating for several years since a stroke paralyzing a portion of his right side. He also had a series of complicating illnesses of varying degrees of seriousness. He also spent the last few months of his life in Mount Sinai Hospital. All of this is not in dispute, nor is it the point. The point is whether or not Mr. Rosenstiel had the basic capacity to execute a codicil adding some executors and trustees to those previously named by him, and thus to carry out the exact instructions he had given in his regard several months before when no one challenges his testamentary capacity.

Although Mr. Rosenstiel was 84, as one of the doctors conceded and as was obvious from all of the witnesses, he was a man of extraordinary mental strength and will. It is one thing to chart somebody on reasonable medical probabilities and it is another thing to examine reality. If there is not the comparative basis of the testator's actual words and conduct, then, reasonable medical probabilities would be of much more importance than they are in a case such as this, where the Court has before it testator's fashioning of the codicil, and his concern with matters basic to him.

What this gets down to is Mr. Rosenstiel saying and doing things which the doctors say he should not have been able to say and do based upon their studies and projections. We start with the proposition that Mr. Rosenstiel was not fond of doctors, and did not hesitate to tell doctors and nurses to get away from him and leave him alone. Dr. Scherr, (P. 362); Dr. Reed, (P. 408); and Dr. Rosenberg, (P. 296). He also took issue with nurses when they disputed his report on whether he was hurting (P 593). The opinions of the doctors herein are at variance with the hospital records as well as with the patient's own conduct. Dr. Reed, one of the only two doctors who saw Mr. Rosenstiel on December 6, 1975, can hardly give a credible opinion that Mr. Rosenstiel did not possess lucidity and capacity on that date when he was walking around, conversing, and so far improved from the condition on September 27th, when Dr. Reed found his condition to be satisfactory from a standpoint of understanding and capacity. Dr. Reed was not able to state any date when he felt Mr. Rosenstiel first became incompetent (385).

The doctors' opinions are at variance with each other. For example, Dr. Scherr believed that on September 27, 1975, Mr. Rosenstiel was comatose and totally incompetent (348). Dr. Reed who saw him the very same day believed that by

11 a.m. that morning Mr. Rosenstiel had recovered to a point that he responded to Dr. Reed's tests to the extent that Dr. Reed was perfectly comfortable acting as a witness to Mr. Rosenstiel's written assent to a multi-million dollar transfer on that morning (405-507). Dr. Reed did not agree with Dr. Rosenberg's notation that Mr. Rosenstiel had improved on December 5, 1975, (423). Despite various inferences as to Mr. Rosenstiel's difficulty in hearing nurse Philogene, who was on duty December 6, 1975, testified: "He could hear very well. Anytime you talked to him he understood" (154). The only doctor other than Dr. Reed who was with Mr. Rosenstiel on December 6, 1975, was Dr. Rosenberg, a fill-in physician who was not Mr. Rosenstiel's regular doctor. Dr. Rosenberg conceded that Mr. Rosenstiel had wanted "to be left alone" (296) and that he had difficulty in getting answers from Mr. Rosenstiel. Dr. Rosenberg had a minimum basis for making any kind of a judgment as to Mr. Rosenstiel's lucidity or competence when dealing with those close to him. Dr. Rosenberg conceded that he was never present when Mr. Rosenstiel talked to anyone else or over the phone (299).

Dr. Rosenberg's own contemporaneous notes on the hospital chart water down considerably the opinion he expressed on the witness stand. Dr. Rosenberg stated that in those notes "I make the comment that he was doing well on that particular day" — and that with reference to "competency" and "lucidity" that day, "in that note I indicated he was more alert today" (298). Dr. Rosenberg stated that this increased alterness represented a comparative change that had occurred over a several day period. Indeed, the improvement was so marked that it was confirmed on December 5, 1975 to Dr. Utz, the consultant from Mayó Brothers. Perhaps the most knowledgeable professional observer of Mr. Rosenstiel's condition was Tom Springer, who had been Mr. Rosenstiel's attendant for three years prior to his death. Tom Springer testified that Mr. Rosenstiel recognized Roy Cohn when he entered (266). Tom Springer detailed events and conversations, including Mr. Rosenstiel's telephone call with Joseph Pearlman. He described Mr. Rosenstiel as "alert" on the morning of December 6th (258). He flatly contradicted the doctors and stated that there were times when Mr. Rosenstiel was "lucid" and ". . . knew what was going on . . ." (260). Springer could not have been plainer in describing Mr Rosenstiel's condition at the key period in this case:

"Let's say at this time Mr. Rosenstiel was at the height of his convalescence in the hospital from September when he had the seizures or whatever or whatever the medical term was, until the time of his death, let's say from Thanksgiving to that time he was at the height of his convalescence in the hospital.

Q. From Thanksgiving on?

A. Until around the 10th of December, let's say." (259; see also 260).

The only non-hospital witness called by petitioners on the issue of competency was Leonard J. Emmerglick. Prof. Emmerglick described Mr. Rosenstiel's active and alert mind and complete mental capacity. Prof. Emmerglick could not be specific as to the date on which he felt Mr. Rosenstiel had begun to fail and had lapsed into "cryptic" conversations (219) and at times did not recognize him.

Counsel for petitioners flatly repeatedly misrepresented to this Court on summation and to various witnesses in questions phrased to them on cross-examination that Prof. Emmerglick stated that after *November 1, 1975,* Mr. Rosenstiel had gone completely to pieces and could not even recognize his dear old friend Prof. Emmerglick. This was a total misrepresentation. The earliest date mentioned by Prof. Emmerglick as his estimate was "late November" — not *November* 1st as repeatedly stated by counsel. Prof. Emmerglick made it clear that up until some time in late November Mr. Rosensteil retained his capacity (215). Despite this, counsel emphatically and

repeatedly misquoted this November first date to the Court and witnesses. For example, to Mr. Nichols: "Are you aware of the fact that after November the 1st, 1975, his old friend, Mr. Rosenstiel, was never again able to recognize Prof. Emmerglick when Prof. Emmerglick came to the hospital on a more or less weekly basis to try to chat, try to visit, try to cheer him up?" (717). Mr. Nichols found that "hard to believe" (717), as well he might since counsel lost a month or two along the way. Emmerglick was unable to fix a date thereafter when he thought that capacity diminished, and could not focus in on December 6 or any other date around then, other than to say he tried to visit periodically (214). Prof. Emmerglick went further than that: When this Court asked him, with reference to his visits to Mr. Rosenstiel until the time of Mr. Rosenstiel's death, whether Prof. Emmerglick believed that Mr. Rosenstiel was "conscious" that Emmerglick "had the letters under his [Rosenstiel's] direction to you" (200). Emmerglick had no difficulty in assuring the Court that Mr. Rosenstiel always retained that conscious thought in Emmerglick's opinion (200). Further, when asked whether he heard Mr. Rosenstiel speak on the telephone with Mr. Nichols, Emmerglick went further and said that between some time between mid-October and Mr. Rosenstiel's death on January 21, 1976, it was Mr. Rosenstiel himself who told Emmerglick that Mr. Rosenstiel had spoken with Lou Nichols (218).

Mrs. Polansky, the only other non-hospital witness for petitioners, did not testify on direct examination as to Mr. Rosenstiel's capacity. On cross-examination, although she stated that for the most part, Mr. Rosenstiel was "out of it," nevertheless said, when it came to a question of important business discussions between Mrs. Polansky and Mr. Rosenstiel during the week of December 19, 1975 — two weeks after the codicil had been executed — Mrs. Polansky had no doubts about Mr. Rosenstiel's capacity and understanding. She described a conversation in which she asked him whether he wanted to scuttle the book. Mr. Rosenstiel refused and instead insisted that Mrs. Polansky "keep your promise" to have his economic thoughts on library shelves of universities. There was no question but that "he understood me" (280). Mrs. Polansky described the visit of Cathy and Jimmy Finkelstein to the hospital at this same period (284).

As to the Christmas Eve tape produced by Mrs. Polansky in this case, it was adduced originally by the respondents on deposition. Considering the circumstances of its having been made within the last month of his life, at the end of the day, in the evening, when Mr. Rosenstiel was out of his hospital room visiting Mrs. Polansky's hospital room, the responses, the song recollections and the various statements made by Mr. Rosenstiel totally belie the picture of someone who was virtually catatonic, without memory and incapable of initiating a request. Indeed, it was almost amusing to note how Dr. Rosenberg had to modify his testimony as to what Mr. Rosenstiel could not do in order to explain exceptions for the many things which the tape showed he did do despite medical prognosis that it was impossible.

Granting the testimony of the hospital people referred to above, none of whom other than Springer had a long and frequent relationship with Mr. Rosenstiel — stack it up against the unequivocal testimony as to lucidity, understanding and capacity by one long-time friend and associate of Mr. Rosenstiel's after another. Direct conversations and dealing with Mr. Rosenstiel concerning business matters, in which he displayed his complete consciousness and alertness before, during and after the codicil and the signature, was given by Lou Nichols, Nora Hayes, John Beemer, Victor Aldridge, Maurice Benjamin, and above all by petitioner Greenbaum himself, who confirmed conversations with Mr. Rosenstiel just before and just after December 6 1975, in which actual legal cases were discussed and concerning which Mr. Rosenstiel asked questions and offered opinions — one of the conversations having been a call initiated and placed by Mr. Rosenstiel to Mr. Greenbaum just days before the execution of the codicil. This case breaks down as follows:

| TESTIMONY OF FRIENDS AND ASSOCIATES AS TO LUCIDITY | | TESTIMONY OF HOSPITAL PERSONNEL AS TO NON-LUCIDITY | |
|---|---|---|---|
| *Witness* | *Years of Acquaintance* | *Witness* | *Years of Acquaintance* |
| John Beemer | 40 | Dr. Ronald Scherr | 1 yr. |
| Nora Hayes | 30 | Dr. Eugene Rosenberg | 3 mos. |
| Maurice Benjamin | 45 | Dr. Gerald Steinberg | 1 mo. |
| Roy Cohn | 28 | Dr. Harold Reed | 2 yrs. |
| Louis B. Nichols | 20 | Adelle Rosen | mos. |
| Thomas A. Bolan | 19 | Tricide Philogene | mos. - parttime |
| Maurice Greenbaum | 20 | | |
| Joseph Pearlman | 28 | | approx. 5 years |
| Victor Aldridge | 15 | | |
| Tom Springer | 3 | | |
| David Tackett | 2 | | |

approx. 250 years*

*Roberts, the accountant for Mr. Rosenstiel, is getting paid by Mr. Rosenstiel's trust of which Mr. Greenbaum is the trustee (828). The esteem in which Mr. Rosenstiel held Mr. Roberts may be gathered from Mr. Roberts' testimony wherein Mr. Roberts stated that in five conversations with Mr. Rosenstiel, Mr. Rosenstiel's only response to him was by way of a grunt.

The testimony of the people who knew Mr. Rosenstiel for many years is overwhelming that Mr. Rosenstiel was mentally competent at frequent times during his last hospitalization. Even the hospital personnel produced as witnesses for the petitioners show that at various times during this period Mr. Rosenstiel was mentally competent. For example, Dr. Reed testified as follows as to Mr. Rosenstiel's condition at eleven o'clock on the morning of September 27th — a date described by him as the most critical of Mr. Rosenstiel's hospitalization:

"I found him [Rosenstiel] to be alert, responsive, cognizant and aware of what was going on around him" (401).

Similarly, the attendant, Tom Springer, testified that in December Mr. Rosenstiel carried on lucid conversations with people he wanted to talk with (259) and that he was alert on December 6th (258). He stated that from Thanksgiving until about December 10, 1975 (the period during which the condicil was executed), Mr. Rosenstiel was at the height of his convalescence (259), and that from time to time he had lucid moments and knew what was going on (260).

Mr. John Beemer (who had worked for Mr. Rosenstiel for 40 years and was his executive assistant) testified by deposition as to various conversations with Mr. Rosenstiel during which Mr. Rosenstiel was "very lucid" (770; see also 763-766; 774-775). Mr. Beemer described a conversation held with Mr. Rosenstiel in December of 1975 which demonstrates beyond any doubt Mr. Rosenstiel's lucidity at that time (775-777). Mr. Beemer testified:

A. Well, the documents that appeared in papers about the Zoning Commission — I can't remember. That was in December sometime.

Q. December of 1975?

A. Yes.

Q. Did you call him or did he call you?

A. I called him.

Q. What did you say to him, sir?

A. I kept him apprised of everything that went on about the farm and this particular document had to do with the Zoning Commission trying to establish a corridor through certain parts of the property up there for ecology purposes.

Q. I don't mean to cut you off. Did you read the document to him?

A. I read the document at his request.

Q. When you first called him?

A. When I first called him I told him about the document and I said it mentions the farm — Conyers Farm Lake.

Q. Did he say anything to you?

A. I asked him if he wanted me to read the whole article and he said yes.

Q. Whereupon you read the article?

A. Whereupon I read the article.

Q. Did he make any comments?

A. The comment was that he would like to find out immediately — he didn't put in that word, but he wanted to know what acreage their proposition covered and he said to get in touch with Lennon and find out.

Frank Lennon is an attorney in Greenwich who has handled some of Mr. Rosenstiel's property matters — which I did.

Q. Did you report back to him?

A. I never got a report.

Q. Did you inform Mr. Rosenstiel that you had given those instructions to the attorney?

A. Yes, I did.

Q. Did he make any comments to you regarding that?

A. The only comment was "Let me know as soon as you find out."

Practically all of the witnesses, including the medical witnesses, testified that Mr. Rosenstiel's mental ability varied from day to day and even during the course of the day (e.g., Dr. Reed, 418-419). In fact, Mr. Rosenstiel's "behavorial pattern had been so variable" that Dr. Reed did not feel capable of testifying as to his mental characteristics on December 6, 1975 (380). The attending physician, Dr. Scherr, testified that September 27 through September 29 "was the most critical period" of any time during his hospitalization (348). He testified that thereafter Mr. Rosenstiel gradually improved until "three or four weeks before his death" (354). Dr. Scheer and Dr. Reed conceded the extremely important distinction — Mr. Rosenstiel resented doctors and resented his mental acuity being tested (408) but that when it came to close friends he responded to them in conversational terms. Insofar as Dr. Scherr's reference to the dose of tranquilizer medication being given to Mr. Rosenstiel that day as "moderate" (355), Mr. Rosenstiel had been medicated over at least a four year period, intensively at times, and had undoubtedly developed the normal tolerance to medication.

The testimony of the people who knew Mr. Rosenstiel best is absolutely persuasive. Nora Hayes, his secretary for 30 years, testified to Mr. Rosenstiel's alertness in personal conversations and over the telephone (619); Mr. Maurice Benjamin (his close friend and stock broker for over 45 years) found Mr. Rosenstiel to be alert and

clear and wide awake (753) and that there was no doubt that Mr. Rosenstiel understood what he was saying and that he understood what Mr. Rosenstiel was saying in their telephone conversations (754); Mr. Thomas Aldridge (a friend and former employee of Mr. Rosenstiel's) testified in great detail as to a very lucid face-to-face conversation he had with Mr. Rosenstiel on January 1, 1976 (589-592); Mr. Joseph Pearlman, who had known Mr. Rosenstiel for 28 years, testified that "many times he was alert" and was alert on December 6 (649).

Louis B. Nichols has had a career of impeccable distinction in government, public and charitable callings and in business. Mr. Rosenstiel himself described Mr. Nichols as a man of "sterling character". (Emmerglick's letter). It was Mr. Nichols who was selected to deliver the eulogy at Mr. Rosenstiel's funeral services in Cincinnatti. Mr. Nichols testified that in a conversation he had with Mr. Rosenstiel on December 8, 1975, two days after execution of the codicil, that Mr. Rosenstiel was "very sharp" (707) and that "he showed perfect comprehension of what he was saying and perfect knowledge of what he was saying" (719). One of the key conversations in this case is between Mr. Rosenstiel and Mr. Nichols on December 8, 1975 — just two days after Mr. Rosenstiel had executed the codicil:

"A. I talked to him on the evening of December the 8th from my reidence over to Marco Island.

Q. Now, did you call Mr. Rosenstiel or did he call you?

A. Well, it was on my bill, so I called him.

Q. And what conversation — would you tell the Court, please — what conversation you had with Mr. Rosenstiel, what you said to him and what he said to you as best you can recall.

A. Well, it started out to be a general conversation. I called to say hello to him, how he is getting along. He inquired how the family and I were and then he made the comment that Roy had been in to see him and spoke very fondly of Roy.

Q. Did he say "Roy"?

A. Roy Cohn.

Q. Yes, sir.

A. And I said, well, that is fine, and of course, I had known of the relationship that existed over a period of years between Roy and Mr. Rosenstiel.

He then discussed a couple of old Schenley matters and I was particularly interested in Rapid American bonds and he said that he throught the bonds were good, to hold them.

We had a bunch of the bonds and one of the foundations that he had the responsibility for, the man's family had some bonds, and then he started talking about some of the difficulties he has had with the new chairman of Rapid American and then, all of them who negotiated the deal to purchase his stock.

He had commented about litigation that he had been through or Schenley preferred stock and had got a very successful outcome from the Delaware courts and that in essence, he talked a little about the economy, asked me what I thought.

I told him things were improving. He though they were too. We were in the upswing and that in essence, is the conversation.

It lasted, I would say, five, six minutes, something like that, in the neighborhood.

Q. During the course of this conversation that you had by telephone with Mr. Rosenstiel, would you describe to the court his manner of speaking?

A. Oh, he was very sharp. He spoke with some degree of rapidity. There was vibrancy in his voice that I had not noticed on previous occasions. He seemed to be in a cheerful mood and he seemed like he was his old self.

Q. How had he recalled past events or other things to indicate that to you?

A. Well, the discussion of the Ricklas (phonetic) situation, Rapid American Bonds — oh, also, in discussing Rapid American Bonds and Ricklas, I had had only one serious rupture with Mr. Rosenstiel and that resulted from a conversation that Ricklas had with me to the effect that Mr. Rosenstiel was going to make him chairman of the Board.

\*     \*     \*     \*

In a conversation with him, I had talked to him at great length about the advisability of his making this deal and on the December 8th conversation, he made the observation that I was right on Ricklas.

Reference has already been made to Mr. Beemer's testimony. In addition, Mr. Bolan, who had known Mr. Rosenstiel for 19 years, testified as to his alterness on November 10th at the time Mr. Rosenstiel gave his final instructions concerning the preparation of the codicil.

Also, the testimony of Mr. Greenbaum is of vital significance. He supervised and witnessed the execution by Mr. Rosenstiel of a document which significantly affected Mr. Rosenstiel's estate on September 27, 1975 (479). He also testified that on September 26th, Mr. Rosenstiel approved the purchase of one million dollars of Flower Bonds and that Mr. Rosenstiel specifically remembered a conversation that he had had with Greenbaum on September 3rd concerning the Flower Bonds and the transfer of money from the irrevocable trust (467-469).

Mr. Greenbaum testified that late in November — just days before the execution of the codicil — Mr. Rosenstiel *initiated* a telephone call to Mr. Greenbaum in the course of which Mr. Rosenstiel referred to a telephone conversation he had had with Roy Cohn with reference to a litigation involving the Nizer firm. Mr. Rosenstiel inquired of Greenbaum as to details of that case and its status (501-502). Shortly after the execution of the codicil and later in the month of December, 1975, Mr. Greenbaum himself telephoned Mr. Rosenstiel to discuss developments in still another litigation. The conversation as reported by Mr. Greenbaum along with Mr. Rosenstiel's comments, is totally supportive of Mr. Rosenstiel's lucidity and understanding when it came to his personal affairs which interested him.

Q. Did you at any time discuss with Mr. Rosenstiel by telephone the disposition of any litigation between September 27 and the date of his death?

A. Yes.

Q. Tell the court, please, what was the date as best you recall and what discussion you had with Mr. Rosenstiel? What did you say to him; what did he say to you?

A. Following Susan Rosenstiel's unsuccessful efforts to have her alimony increased, she brought a lawsuit against Mr. Rosenstiel, me, and my law firm for $25,000,000 for false arrest. On the face of it, it seemed to be a rather amusing kind of legal action, but Mr. Rosenstiel did not see any humor in it and we brought a motion to have it dismissed and

after some change of counsel on her part, there was a stipulation of discontinuance, which we insisted be signed by her personally as well as her lawyer, which is a bit unusual. And when this happened, I called Mr. Rosenstiel and told him about it.

Q. What did he say to you, if anything?

A. "Good. Great," or some short response of that sort.

Q. Was that the extent of his comments?

A. He may have added something about she should have gone to jail or something of that sort.

Q. When did this conversation take place?

A. It was in December prior to Christmas, about a week prior."

It should be noted with reference to the testimony of the witnesses Nichols, Beemer, Hayes, Benjamin and Aldridge, that each and every one of them is a totally disinterested witness with no stake whatsoever in the outcome of this proceeding and with no motive for testifying other than with complete truthfulness and factuality. Indeed, several of them have close relationships with the petitioners. The heavy burden of proof as to incompetency was in no respect met by petitioners in this case.

## POINT V
### THE "CONSPIRACY" THEORY

Petitioners' first theory that Mr. Rosenstiel never signed the codicil evaporated into their second theory that he lacked testamentary capacity, which second theory was in turn propped up by "fraud" which became the third theory. Shortly before trial petitioners invoked still a fourth theory — this one entitled by them "conspiracy". It is apparently a series of assumptions made by petitioners by working backward from the filing of certain claims by Sidney Frank Interests against the estate.

Anyone with knowledge of the family litigiousness of the Rosenstiel family, as this Court can gather from the testimony, would reject out of hand any suggestion that a family relationship creates a basis for harmony, no less conspiracy. The exact opposite has always been true. Without detailing the past history, glimpses of which have come to the attention of the Court through the hospital order dividing visiting rights between warring factions in the family, suffice it to say that petitioners have failed to present one single word of affirmative proof in support of any kind of a conspiracy between Cathy Finklestein and Sidney Frank, other than the reference of their relationship to each other.

To the contrary, Cathy Finkelstein took the following steps: (1) she refused to join in any claims being made by her father and her brother, as is obvious from the fact that she is not a claimant in any of the claims filed in this case; (2) immediately following the filing of the claims, she and her husband objected to *all* of the Frank claims, including the derivative one through the United California Bank, concerning which it is contended Cathy could have an indirect interest. It is certainly true that objections can be withdrawn, but it is also true that before objections can be withdrawn under Florida law, unanimous action by the personal representatives is required — thus giving Southeast First National Bank veto power over any attempt by Cathy or Jimmy to withdraw or settle any claim. Furthermore, such determinations concerning claims will be subject to the final approval of this Court. In other words, the risk of influence by Cathy and Jimmy is absolutely non-existent, even if there were any intent along these lines, which their actions prove there is not.

The uncontradicted evidence concerning the preparation of the codicil, beginning with Mr. Rosenstiel's instructions in the summer, through to the day he died, shows that Cathy and Jimmy were in no way consulted about or involved with Mr.

Rosenstiel's thinking or plans, nor were they, according to the record, even aware of them until some time after the codicil had been executed.

This would have to be the strangest conspiracy ever, without a word of proof that the conspirators even knew of its existence. Far from sustaining a heavy burden of proof on this theory, petitioners have failed to adduce a single word of testimony to support it, and there is no evidentiary basis for asking the Court to even consider it.

Petitioners at best are raising prematurely points involved in the administration of claims, all of which will ultimately be determined by the Court, and that have no bearing or relevance to the only issue in this case — the probate of the codicil.

## POINT VI

### IN AN OBVIOUS EFFORT TO BECLOUD THE REAL ISSUES PETITIONERS HAVE CREATED SPURIOUS ISSUES NECESSARILY KNOWN BY THEM TO HAVE NO BASIS IN FACT

There are certain aspects of petitioners' case that require comment. It seems to be pervaded with unnecessary personal attacks on Mr. Cohn and insinuations and innuendos which were never translated into testimony or supported by proof. An excellent example is the presentation by petitioners of Richard Zaccarro as their first witness. Mr. Zaccarro testified on direct examination that Mr. Cohn had come to the hospital after 8 p.m. (108). He could not identify the date as December 5, 1975 by any point of reference other than that it was the night Mr. Rosenstiel was put on the critical list. "I can't say the date, but if you look at the record in the hospital you can verify the date." He was virtually "comatose" . . . he got better" . . . a week later but right then he was in bad shape" (110, 111). Zaccarro could cite no other clue to the date except that it was the night Mr. Rosenstiel went into the coma.

Based on this testimony the petitioners represented through their leadoff witness that on the night of December 5, 1975 Mr. Cohn had gone from the airport to the hospital with a bag, asked the nurse and attendant to leave the room, and made a stealthy and abortive attempt to have the codicil signed, albeit there were no witnesses around and it would not have been worth the paper it was written on, if any such thing had happened.

Of course we know from the trial testimony that Mr. Cohn never went to the hospital on the night of December 5. He and Tackett arrived from New York on Eastern Airlines some time after 8 p.m. They were met at the airport by Fort Lauderdale mortgage banker Peter Rochon, whose guest they were for the Dolphins-Buffalo game on December 7 (513, 514). Rochon was accompanied by Philadelphia businessman Robert Leathers (513). The four of them drove to the Whiffenpoof Restaurant in Coral Gables, where they had a late dinner and remained until approximately 11:30 p.m. (514). Rochon, Leathers and Tackett took one car, Cohn took the other, headed toward his Miami apartment north on 95, and the two cars parted on the expressway. Any suggestion that Rochon, who has absolutely no interest or involvement in this case whatsoever, would lie or was in any way inaccurate, was not even attempted by petitioners.

The clear fact is that Mr. Cohn was nowhere near the hospital after 8 p.m. on December 5, 1975. But this entire incident is actually most significant. It demonstrates the unfairness and lack of quality of petitioners' case. This became apparent during the cross-examination of their opening witness, Zaccarro, and was sealed by the testimony of petitioner Greenbaum. Greenbaum testified that he came down on a plane from New York on the night of September 27, 1975. Greenbaum testified that he proceeded directly from the airport to the hospital (463). Greenbaum

testified that he brought a briefcase to the hospital with him (464). Greenbaum testified that the attendant in Mr. Rosenstiel's room that night was none other than our friend Zaccarro (471). Greenbaum testified as to his abortive attempt to feel Mr. Rosenstiel out about signing the trust transfer document on that night (468). Greenbaum testified, as did Dr. Scherr, Dr. Reed, Tom Springer and the hospital records, that it was on this night — not December 5 — that Mr. Rosenstiel became critically ill and was expected to die (473).

We turn back to Zaccarro's testimony, "I can't say the date but if you look at the record in the hospital you can verify the date." This having been done, it became conclusive that the date was September 26, and that the man with the document was the petitioner Greenbaum and not Cohn. Small wonder when Zaccarro was asked on cross-examination whether he was not confusing this whole incident with September 27 he replied, "I am not sure of anything." (133)

Knowing all of these facts, why would petitioners nevertheless not only permit but affirmatively offer the obviously mistaken testimony of Zaccarro in an unjustified and unsupportable attempt to discredit Cohn? Who was it who suggested to Zaccarro that he fix the date of the coma at December 5, rather than the September date which was well known to all connected with the case as the accurate one? Of similar import was the tactic used in cross-examining Nora Hayes, Mr. Rosenstiel's personal secretary for 31 years. Mr. Melvin suggested in a question to Miss Hayes that Miss Hayes had told her friend Hanna Polansky that "Roy has the case in the bag and you better line up with him" (621). This question contained a poisonous insinuation and called for the utmost good faith. Although Hanna Polansky was on the witness stand the day before as petitioners' witness ,never was she asked if Nora Hayes had said any such thing to her (Nora Hayes had been deposed in New York and her testimony was no secret to petitioners). And after Miss Hayes denied ever having made such a statement, petitioners never recalled Hanna Polansky on rebuttal to testify that any such statement was ever made. But the innuendo in counsel's question was left hanging.

In counsel's summation a bitter attack was launched on Mr. Cohn for having violated his obligation as Mr. Rosenstield's friend and attorney by stealthily entering Mr. Rosensiel's hospital room on the night of December 5, and then again in connection with the execution of the codicil on December 6, characterizing this as a gross breach of fiduciary duty. While making these charges petitioners' counsel must have known full well that it was his client, the petitioner Greenbaum, who had entered Mr. Rosenstiel's room under those circumstances on the night of September 27 — not Cohn on the night of December 5.

While the petitioners have tried to put the "black hat" on Roy Cohn during the course of this trial, the record does not show one derogatory reference to him. What does the record show concerning Roy Cohn? It shows he was Mr. Rosenstiel's friend for 28 years. It shows he was Mr. Rosenstiel's trusted lawyer for 20 years. When Greenbaum concedes that Mr. Rosenstiel discussed Cohn's service as an executor and in a fiduciary capacity, and in so doing expressed his respect and regard for Cohn,

Q. "Did he express any sentiments concerning his affection or respect for Mr. Cohn?

A. Yes, he thought well of him in personal terms."

(503). It shows that in the Emmerglick letter which Mr. Rosenstiel addressed to his daughter Elizabeth, the one human being whose opinion Mr. Rosenstiel cited to his daughter in the letter was that of Roy Cohn.

The record of this entire proceeding shows that Mr. Cohn has conducted himself with complete propriety. He has made no application elsewhere. The law firm with which he is associated has not attempted to fulfill the role of co-counsel of

record to our firm in this case, although Greenbaum, Wolf & Ernst has done so with reference to the bank. Mr. Cohn has abided by the letter and spirit of all directions of this Court prior to and during the trial. Mr. Cohn took the stand prepared to testify fully to both direct and cross-examination, but was of course prevented from doing so when the petitioners exercised their right to invoke the "Dead Man's Statute".

## CONCLUSION

After full hearing, petitioners have failed to sustain their burden on any of the theories urged. The original determination by this Court in denying the motion to vacate (the petition for certiorari concerning which has now been dismissed by the petitioners), is as appropriate and viable after this trial as it was when entered originally by this Court. It is respectfully submitted the petition should in all respects be denied.

> Respectfully submitted,
> BRADFORD, WILLIAMS, McKAY,
> KIMBRELL, HAMANN & JENNINGS, P.A.
> 9th Floor, Dade Federal Building
> 101 East Flagler Street
> Miami, Florida 33131
> *By Joseph F. Jennings*
> Attorneys for Respondents

The attorneys for the petitioners filed the following —

## POST-TRIAL BRIEF BY PETITIONERS

Petitioners hereby submit their Post-Trial Memorandum of the evidence adduced and presented to the Court during the five-day trial upon the petition to revoke probate of the purported Second Codicil, dated December 6, 1975, to the Last Will and Testament of LEWIS S. ROSENSTIEL, Deceased:

I. *The decedent lacked testamentary capacity on December 6, 1975.*

Petitioners' evidence on the medical and mental incapacities of the decedent on December 6, 1975, was overwhelming. Four of Mr. Rosenstiel's attending physicians, four of his private duty nurses and attendants, and other lay witnesses, including Professor Leonard Emmerglick, testified that Mr. Rosenstiel lacked the requisite testamentary capacity on December 6, 1975.

The expert medical testimony was uncontradicted. At the age of 84, Mr. Rosenstiel entered Mt. Sinai Hospital on September 16, 1975, to control vomiting. Prior to this last hospitalization, he had suffered from poor health, and in 1971, he suffered a stroke which paralyzed his right side and impaired his speech. He could not walk without assistance. His eyesight was poor, and he had little or no sight out of his left eye. He had a history of prostate cancer involving the nearby bone structures, and also suffered from diabetes, high blood pressure, uremia, anemia, metabolic blood disorders, and atrial fibrillation leading to episodes of heart failure.

During his last hospitalization, a brain scan and other neurological tests of Mr. Rosenstiel revealed moderately advanced cortical atrophy and marked Alzheimer's Disease, causing pre-senile dementia and organic brain disorders. During his hospitalization from September, 1975, to his death on January 21, 1976, he was treated by Drs. Ronald Scherr, Eugene Rosenberg, Harold Reed, Gerald Steinberg (neurologist) and others who diagnosed and treated him for convulsions, carcinoma of the prostate, kidney failure, heart failure and infarcts and atrophy of the brain. Upon doctor's orders, the nurses administered drugs, such as Dilantin, Thorazine and Demoral at regular intervals, twenty-four hours a day, and tended to his every bodily and personal need.

On October 17, 1975, Dr. Scherr entered a medical order that the nurses and attendants were not to permit Mr. Rosenstiel's visitors to engage him in any further business discussions or decisions.

At the trial, Drs. Harold Reed and Eugene Rosenberg testified that they each separately visited Mr. Rosenstiel on the morning of December 6, 1975. Based on these visits and their knowledge of his medical condition generally, each doctor was firmly of the opinion that the decedent lacked testamentary capacity on December 6, 1975. In their opinions, he lacked the ability to manage or conduct any type of business or personal matters.

Dr. Ronald Scherr, Mr. Rosenstiel's treating physician, was of the medical opinion that as a result of Mr. Rosenstiel's deteriorated medical condition, including advanced cerebral atrophy, he was disoriented as to his own identity, the time and place. Dr. Scherr testified that the drugs administered to Mr. Rosenstiel by the nurses on the morning of December 6, including the tranquilizer, Thorazine, given at 7 a.m. on December 6, 1975, would impair or diminish his mental ability and awareness for eight hours. The disputed Codicil was allegedly signed about four hours later.

Dr. Gerald Steinberg testified that, based on his visits and treatments of Mr. Rosenstiel during the month of October, 1975, and the findings of an electronic brain scan, Mr. Rosenstiel lacked the ability to exercise high order cognitive thought processes as a result of marked and advance brain disorders, which was consistent with a finding of Alzheimer's Disease. At all times, Dr. Steinberg found him to be lethargic, confused, disoriented and suffering from severe mental obtundation.

Two of Mr. Rosenstiel's attending nurses, Mrs. Adele Rosen and Tricide Philogene (who were on duty on December 6, 1975) testiried that Mr. Rosenstiel could not carry on an intelligent conversation with anyone, including the doctors, nurses, family or friends. His speech was guttural, monosyllabic and often unintelligible. His level of comprehension was so poor that he could not discuss or explain his symptoms or ailments to his doctors or nurses. Care was taken to "introduce" persons (including his wife and daughter) to Mr. Rosenstiel on each visit, but he would often forget their identity within a few minutes, or act like the visitors were not even present in the room. According to nurse Rosen, the nurses and his daughter, Elizabeth Rosenstiel, tried to "make him look good."

Professor Emmerglick testified that Mr. Rosenstiel, his old friend and confidant, could not even recognize him after November, 1975.

In response to the Petitioners' expert medical tetstimony, the Respondents failed to produce even one contradictory medical opinion on the issue of Mr. Rosenstiel's medical competency on December 6, 1975. Their attempt to demonstrate that Mr. Rosenstiel had the requisite testamentary capacity fell far short of the mark. They would have this Court disregard the uncontradicted medical testimony presented by the Petitioners, and rely upon the lay opinions of Mr. Lou Nichols, who had a five minute telephone conversation with Mr. Rosenstiel on December 8, 1975, and Victor Aldridge, the liquor businessman, who spent a few minutes talking with Mr. Rosenstiel in his hospital room on January 1, 1976. The only other evidence Respondents presented to the Court even worthy of mention on the issue of competency was the testimony of Nora Hayes, who admitted her bias and partisanship towards the Respondents, and the tainted and discredited deposition testimony of Joseph Pearlman.

In sum, it is respectfully submitted that the Petitioners have unquestionably met their burden in proving that the decedent lacked testamentary capacity to execute the purported Codicil on December 6, 1975.

II. *The purported codicil was procured by fraud and trickery.*

Mr. Rosenstiel was the victim of fraud, trickery and deceit practiced on him by Roy M. Cohn, one of his attorneys.

There is uncontradicted testimony by at least three disinterested witnesses that the Respondent, Roy M. Cohn, fraudulently presented the purported Codicil to the decedent and procured his "signature" thereon as a routine post-marital legal paper that related to Susan Rosenstiel, a divorced fourth wife of the decedent. As the Respondents admitted at the trial, the Codicil has absolutely nothing to do with Susan Rosenstiel. Thomas Springer, the attendant who was on duty at Mr. Rosenstiel's hospital room on the morning of December 6, 1975, testified:

> A. I think after he went over to the bed and talked to Mr. Rosenstiel and had an opening conversation over politics, let's say, or business and finance, he came over and said, "I have a paper here I would like to get signed today to terminate the affairs of Susie."
>
> I believe before he brought up the affair of Susie there, before he approached me about the paper. He was talking about Susie and things hadn't been going too well for her and she wasn't going to get credit, there's a possibility that she is going to go to jail or some kind of court things going on and so forth, and he said, "This will take care of it," or something like that.
>
> Q. What do you recall he said to Mr. Rosenstiel about Susie?
>
> A. "You know all these things, Lew, she hasn't got a leg to stand on, and all this stuff. This will take care of it once and for all. It will be finished."

Nurse Philogene corroborates this testimony. Also Richard Zaccaro, the attendant on duty from 7 p.m. until 7 a.m. on December 5, 1975, testified that Mr. Cohn visited Mr. Rosenstiel the evening of December 5th, sometime between 8 and 11 p.m., and that Mr. Cohn told him that he had a document that he wanted Mr. Rosenstiel to sign that pertained to a "woman." Mr. Zaccaro testified that Mr. Cohn tried to get Mr. Rosensiel to sign the document on December 5th, but Mr. Cohn was unable to succeed because Mr. Rosenstiel was "out of it."

But Mr. Cohn's trickery and fraud, as the testimony showed, didn't stop there. After nurse Philogene objected to Mr. Cohn's attempts to get Mr. Rosenstiel to sign the Codicil, she left the hospital room to get the hospital administrator (Mr. Babcock). Instead of waiting for Mr. Babcock to arrive, Mr. Cohn proceeded to secure Mr. Rosenstiel's "signature" on the document. When nurse Philogene returned to the room with Mr. Babcock, Mr. Cohn or the gentlemen with him in the room told Mr. Babcock that they were just to visit Mr. Rosenstiel, and that no business was to be or had been transacted. Further, after allegedly securing the decedent's "signature" to the disputed Codicil, Mr. Cohn told Mr. Springer that he was leaving a copy of what Mr. Rosenstiel had signed in his hospital room with Mr. Springer to be given to the family. The document left behind by Mr. Cohn was identified and introduced into evidence by the Petitioners. It is a two-year old process server's affidavit, dated in March, 1974, pertaining to the decedent's divorce from Susan Rosenstiel.

It is not astonishing that the Respondents failed to present any believable evidence to contradict testimony of the disinterested nursing and hospital personnel on this issue. The Petitioners' proof of fraud by Mr. Cohn was conclusive and controverted only by Mr. Cohn, himself.

Thus, it is abundantly clear that, in his debilitated physical and mental condition, Mr. Rosenstiel was tricked and defrauded by Mr. Cohn into executing the purported Codicil as being a document regarding his divorced wife, Susan. Consequently, the instrument is null and void.

III. *The purported codicil was improperly executed.*

The evidence at trial demonstrated that the disputed Codicil was not executed in the manner required by law.

In regard to the alleged "signature" by Mr. Rosenstiel, Mr. Robert Vollmer, a handwriting expert, known well to the Court, testified that the pen marks on the Codicil that purported to be Mr. Rosenstiel's signature did not resemble anything that he had ever seen in all the years of his experience. He testified that he couldn't conduct the conventional handwriting analysis because he couldn't find any legible characters in the "signature."

Assuming the decedent executed the document, the evidence adduced demonstrated that Mr. Rosenstiel executed the document under a belief that it pertained to a legal dispute with his fourth wife, Susan, and not a Codicil to his Last Will and Testament, as it purports to be. Also, from the testimony of Mr. Thomas Springer and nurse Philogene, it is clear that the decedent did not read the document, nor was it read to him. He did not request the witnesses, Cohn and David Tackett, to be witnesses, nor did he declare the instrument to be his Codicil, although these events are specifically set forth in the attestation clause of the purported Codicil.

Further, nurse Philogene testified that after the alleged execution of the document, but before Cohn or Tackett signed as witnesses, Mr. Cohn asked her to be a witness to the alleged "signature" of Mr. Rosenstiel even though she had not been present in the room to observe the alleged execution. This fact alone casts an incriminating pale of impropriety over the entire execution issue.

IV. *The Frank claims*

The Court admitted into evidence ten claims filed by the father (Sidney Frank) and brother (Matthew Frank) of the Respondent, Cathy Frank Finklestein, and the trustee (United California Bank) of a California trust for the benefit of Cathy Frank Finkelstein against the estate . These claims involve four claims by Sidney Frank totaling in excess of $2½ million, four claims by Matthew Frank totaling approximately $900,000 and two unliquidated claims for the benefit of Cathy Frank Finkelstein by the bank in excess of $1 million. Mr. Sidney Frank's claims against the estate seek to deplete the entire assets of the estate based upon an alleged oral promise by Mr. Rosenstiel in 1944 regarding the contents of this Last Will and Testament.

On the fraud issue, this evidence is merely circumstantial. But on the issue of the credibility of the Respondents' testimony, this evidence has a telling impact. These claims seriously discredit the Respondents' contention that Mr. Rosenstiel wanted the Codicil for the "protection" of his daughter, Elizabeth Rosenstiel, and to add a "fighter" to the group of people who would manage his estate affairs.

The purpose of the purported Codicil seems apparent. If the potential true monetary gains in terms of executors' fees, and the control of millions of dollars in probate assets were not sufficient reasons alone for Mr. Cohn to fraudulently procure Mr. Rosenstiel's signature on the purported Codicil at a time when he lacked testamentary capacity, then surely the addition of a voting majority of new personal representatives to the estate to eventually compromise and settle the multi-million dollar claims of the Frank family would be a sufficient reason.

V. *Conclusion*

All circumstances considered, does it appear that Mr. Rosenstiel truly wanted the Respondents to manage his property and assets and protect his daughter, Elizabeth, after his death, as the Respondents contend? Surely not. Is it likely that Mr. Rosenstiel wanted Mr. Roy Cohn as the "fighter" for his estate because the others in whom he reposed great confidence and trust could not be depended upon to "fight" when necessary? No.

122

Petitioners respectfully submit that the evidence at the trial clearly shows that Lewis S. Rosenstiel, deceased, lacked testamentary capacity on December 6, 1975, to execute the purported Codicil, and that said instrument was improperly executed and procured by fraud perpetrated by the Respondent, Mr. Roy Cohn, on the decedent. Accordingly, Petitioners submit that the probate of the purported Second Codicil, dated December 6, 1975, to the Last Will and Testament of Lewis S. Rosenstiel be revoked, and said instrument be held to be null and void.

Respectfully submitted,

MERSHON, SAWYER, JOHNSTON,
DUNWODY & COLE
1600 Southeast First National Bank Building
Miami, Florida 33131
Attorneys for Petitioners
By *Woodrow M. Melvin, Jr.*
and
By *Mark V. Silverio*
GREENBAUM, WOLFF & ERNST
437 Madison Avenue
New York, New York 10022
Of Counsel